1   LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
    Michael W. Sobol (SBN 194857)
2   msobol@lchb.com
    275 Battery Street, 29th Floor
3   San Francisco, CA 94111
    Telephone: 415.956.1000
4
    LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
5   Doug I. Cuthbertson (*pro hac vice* forthcoming)
    dcuthbertson@lchb.com
6   Margaret J. Mattes (*pro hac vice* forthcoming)
    mmattes@lchb.com
7   250 Hudson Street, 8th Floor
    New York, NY 10013
8   Telephone: 212.355.9500

9   LEVIN LAW, P.A.
    Brian Levin (*pro hac vice* forthcoming)
10  brian@levinlawpa.com
    2665 South Bayshore Drive, PH2B
11  Miami, Florida 33133
    Telephone: 305.539.0593
12
    MEYER WILSON, P.A.
13  Matthew R. Wilson (SBN 290743)
    mwilson@meyerwilson.com
14  305 W. Nationwide Blvd
    Columbus, Ohio 43215
15  Telephone: 614.224.6000

16  *Counsel for Plaintiffs and the Proposed Classes*

17              **UNITED STATES DISTRICT COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**
18

19  CONNIE HOWARD, YADIRA YAZMIN        Case No.
    HERNANDEZ, and DEBORAH
20  REYNOLDS,
    on behalf of themselves and         **CLASS ACTION COMPLAINT**
21  all others similarly situated,

22              Plaintiffs,             DEMAND FOR JURY TRIAL

23      v.

24  LABORATORY CORPORATION OF
    AMERICA, LABORATORY
25  CORPORATION OF AMERICA
    HOLDINGS, and META PLATFORMS,
26  INC.,

27              Defendants.

28

1    Plaintiffs Connie Howard, Yadira Yazmin Hernandez, and Deborah Reynolds

2   ("Plaintiffs"), individually and on behalf of California and Pennsylvania Classes of all other

3   similarly situated persons, bring this action against Laboratory Corporation of America,

4   Laboratory Corporation of America Holdings (collectively, "Labcorp"), and Meta Platforms, Inc.

5   (formerly known as Facebook) ("Meta") (collectively, with Labcorp, "Defendants") for their

6   violations of the California Invasion of Privacy Act, Cal. Penal Code § 631 ("CIPA"), the

7   Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa. Cons. Stat. § 5703

8   ("WESCA"); and under the common law claim for Unjust Enrichment (as to Meta).

9                              **NATURE OF THE CASE**

10       1.     This is a class action against Meta for knowingly obtaining individually

11  identifiable information alongside the contents of confidential electronic communications from

12  Labcorp to Plaintiffs, and against Labcorp for enabling Meta to do so, in a manner that violates

13  California and Pennsylvania law.

14       2.     Labcorp knowingly employed hidden tracking code on its website created by

15  Meta, now known as the Meta Pixel (the "Pixel"), which sent Meta time-stamped, personally-

16  identifiable information of Plaintiffs' and Class members' and information of their online

17  activities. Upon information and belief, through the surveillance enabled by the Meta Pixel, Meta

18  obtained large quantities of sensitive data on a daily basis from Labcorp, including the identities

19  of persons who visited the Labcorp website, the pages they visited, and search terms they entered

20  into the website with the results of those searches. Meta combined this sensitive information with

21  information about each user gathered from other sources and used it for purposes not authorized

22  by the persons from which the data was taken. Labcorp website users were not advised that Meta

23  collected this information, and Meta did not have their consent to do so. Defendants' conduct in

24  this regard is expressly prohibited by California and Pennsylvania law.

25       3.     California's CIPA prohibits Meta from learning the contents of Plaintiffs' and

26  Class members' electronic communications from and to Labcorp without the consent of both the

27  sender and recipient of the electronic communication, which Meta lacked, including the

28

CLASS ACTION COMPLAINT

communications of the content alleged herein. CIPA also prohibits Labcorp from aiding, employing, or conspiring with Meta to engage in those unlawful activities.

4.      Pennsylvania's WESCA prohibits Meta from intercepting the contents of Plaintiffs' and Class members' electronic communications from and to Labcorp without the consent of both the sender and recipient of the electronic communication, which Meta lacked, including the communications of the content alleged herein. WESCA also prohibits Labcorp from procuring Meta to engage in those unlawful activities.

5.      Pursuant to Cal. Penal Code § 637.2 and 18 Pa. Cons. Stat. § 5725(a), and California and Pennsylvania common law as to Meta, Plaintiffs seek, on behalf of themselves and each member of the proposed California and Pennsylvania Classes, damages in an amount no less than all available statutory damages, unjust enrichment (as to Meta), injunctive relief, and such other equitable relief as the court determines appropriate.

## **PARTIES**

6.      Plaintiff Connie Howard ("Plaintiff Howard") is a resident of Los Angeles, California.

7.      Plaintiff Yadira Yazmin Hernandez ("Plaintiff Hernandez") is a resident of San Diego, California.

8.      Plaintiff Deborah Reynolds ("Plaintiff Reynolds") is a resident of Hallam, Pennsylvania.

9.      Defendant Labcorp is a Delaware Corporation with its headquarters in Burlington, North Carolina. Labcorp's offices are located at 531 South Spring Street, Burlington, North Carolina, 27215.

10.     Defendant Labcorp Holdings is a Delaware Corporation with its headquarters in Burlington, North Carolina. Labcorp's offices are located at 358 South Main Street, Burlington, North Carolina, 27215.

11.     Defendant Meta is a Delaware Corporation with its headquarters in Menlo Park, California. Meta's offices are located at 1 Hacker Way, Menlo Park, CA 94025.

**JURISDICTION AND VENUE**

12. This Court has personal jurisdiction over Meta because Meta has sufficient minimum contacts with this District in that it operates and markets its services throughout the country and in this District. Meta is also headquartered and has its principal place of business in this District.

13. This Court has personal jurisdiction over Labcorp because Labcorp purposefully directs its conduct at California, transacts business in California (including in this District), has substantial aggregate contacts with California (including in this District), engaged and is engaging in conduct that has and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, including those in California (including in this District), and purposely availed itself of the laws of California.

14. This Court's exercise of personal jurisdiction over Labcorp is also appropriate because Labcorp's activities in California gave rise to and furthered the privacy violations suffered by Plaintiffs. Labcorp employed the Pixel to exfiltrate data from and regarding visitors to its website—including those located in California—and to send that data to Meta where it could be analyzed and monetized for Defendants' financial gain.

15. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2) because this is a class action with more than $5,000,000 in controversy where at least one Class member is a citizen of a state of which one Defendant is not a citizen. Website performance data indicates that, between February 2023 and April 2023, there were over 30 million visits to the Labcorp website and a little over 5 million unique visits per month. Plaintiffs' good faith estimate based upon the populations of California and Pennsylvania indicate that there are at least many thousands of members in both the California and Pennsylvania Classes, resulting in damages that far exceeding $5,000,000, exclusive of interest and costs.

**DIVISIONAL ASSIGNMENT**

16. Venue is appropriate in this Court because Meta resides in this District.

17. This action is properly assigned to the San Francisco Division under N.D. Cal. Civil Local Rule 3-2(d) because Meta is headquartered in San Mateo County.

CLASS ACTION COMPLAINT

**COMMON FACTUAL ALLEGATIONS**

**I.     Background of CIPA**

18.     CIPA is a California state privacy law, which the California legislature enacted in 1967 to "protect the right of privacy of the people of this state" by, among other things, ensuring that communications would not be intercepted or recorded without consent from every party thereto. Cal. Penal Code § 630.

19.     CIPA prohibits "[a]ny person" from "willfully and without the consent of all parties to the communication…read[ing], or attempt[ing] to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained." Cal. Penal Code § 631.

20.     CIPA furthermore prohibits "aid[ing], agree[ing] with, employ[ing], or conspire[ing] with any person or persons to unlawfully do, or permit, or cause to be done" any of the conduct at issue. *Id.*

**II.    Background on WESCA**

21.     WESCA is the Pennsylvania state wiretap law, which the Pennsylvania legislature most recently amended in 1988.

22.     WESCA prohibits "a person" from "(1) intentionally intercept[ing], endeavor[ing] to intercept, or procur[ing] any other person to intercept or endeavor to intercept any wire, electronic or oral communication; (2) intentionally disclos[ing] or endeavor[ing] to disclose to any other person the contents of any wire, electronic or oral communication, or evidence derived therefrom, knowing or having reason to know that the information was obtained through the interception of a wire, electronic or oral communication; or (3) intentionally us[ing] or endeavor[ing] to use the contents of any wire, electronic or oral communication, or evidence derived therefrom, knowing or having reason to know, that the information was obtained through the interception of a wire, electronic or oral communication." 18 Pa. Cons. Stat. § 5703**.**

CLASS ACTION COMPLAINT

### III.     Background of Meta's Platform and the Meta Pixel

23.     **The Meta Platform.** Meta is an advertising company that sells advertising space on the social media platforms it operates. Meta's advertising is based on sophisticated user-categorizing and targeting capabilities that are fueled by the personal data of users of the social media platforms and other Internet users.[1] Meta's targeting abilities are exceptional because Meta surveils users' online activities, both on and off Meta's own websites and apps.[2] This expansive tracking enables Meta to make highly personal inferences about users, such as about their "interests," "behavior," and "connections."[3] Meta compiles information it obtains, makes such inferences, and then uses them to identify personalized "audiences" likely to respond to particular advertisers' messaging. Access to such audiences is extremely valuable to Meta's advertising clients. In 2022, Meta generated approximately $113.64 billion, nearly 98% of its revenue, through advertising.

24.     **The Meta Tracking Pixel.** The Meta Pixel, originally called the Facebook Pixel, was first introduced in 2015.[4] It is now a primary means through which Meta acquires personal information to create customized audiences for its advertising business, although Meta's public-facing descriptions of the Pixel obscure and minimize this fundamental purpose of the tracking code. Instead, Meta characterizes the Pixel as a simple "snippet of JavaScript code" that helps website owners keep track of user activity on their websites.[5] Meta emphasizes that website

---

[1] Meta Business Help Center, *Why advertise on Facebook, Instagram and other Meta technologies*, https://www.facebook.com/business/help/205029060038706 [https://perma.cc/NES6-5W8D].

[2] Meta Business Help Center, *About Meta Pixel*, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 [https://perma.cc/VWK8-7MCH]; Meta, *Facebook Core Audience Targeting*, https://www.facebook.com/business/news/Core-Audiences [https://perma.cc/WX6T-FDWT].

[3] Meta, *Ad Targeting: Help your ads find the people who will love your business*, https://www.facebook.com/business/ads/ad-targeting [https://perma.cc/DU6C-UHFV].

[4] Cecile Ho, Meta, *Announcing Facebook Pixel* (Oct. 14, 2015), https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/ [https://perma.cc/M7XS-2LEJ].

[5] Meta for Developers, *Meta Pixel*, https://developers.facebook.com/docs/meta-pixel/ [https://perma.cc/BE7F-K93P]; Meta, *Retargeting: Inspire People to Rediscover What They Love About Your Business*, https://www.facebook.com/business/goals/retargeting [https://perma.cc/M3DG-8YN4 ] (Meta Pixel "tracks the people [who visit your website] and the type of actions they take.")

managers can set up a Pixel easily, without any help from their web developer. "You only need to place a single pixel across your entire website."[6] The Pixel is installed on an estimated 30 percent of popular internet websites.[7]

25.     The Meta Pixel sends Meta volumes of information about each visit to each website where it is embedded. Regardless of the purpose (if any) a website owner may have for allowing the Meta Pixel to function on its webpages, the code is configured to capture a substantial amount of information by default. Since 2015 when it was introduced, the Pixel has transmitted HTTP header information, including the URL of each page visited on a website, by default. In 2017, Meta quietly modified the Pixel code to transmit additional information automatically, including "microdata" (details about the website and substance of what it offers), other "contextual information" (including details about the structure of a particular webpage), and "SubscribedButtonClick" information (details about buttons available to click on each page including the text), which fires each time a user clicks on a hyperlink or button on the webpage.[8] Meta made these changes to learn more about website users for advertising purposes.[9] Since 2017, the Pixel has been configured to gather all such information indiscriminately and by default without intervention from the website owner requesting the information be tracked.

26.     In 2018, Meta again modified the default operation of the Pixel to maximize the private information it transmits. Meta introduced a "first-party cookie option" for the Pixel, to circumvent improvements in how web browsers block third-party cookies (a primary means by

---

[6] *Announcing Facebook Pixel*, *supra* n.4.
[7] Maria Puertas and Simon Fondrie-Teitler, The Markup, *In 2023, Resolve to Fix Your Organization's Meta Pixel Problem* (Jan. 31, 2023), https://themarkup.org/levelup/2023/01/31/in-2023-resolve-to-fix-your-organizations-meta-pixel-problem [https://perma.cc/89JD-8RL5].
[8] PixelYourSite, *Automatic Facebook Pixel Events*, https://www.pixelyoursite.com/major-facebook-pixel-update-automatic-facebook-pixel-events [https://perma.cc/2UQU-PG3K]; Carey-Simon, George, WeRSM,
*Facebook Pixel is about to Get a Bit Smarter* (Apr. 28, 2017), https://wersm.com/facebook-pixel-get-little-smarter/ [https://perma.cc/4MPQ-DXU8].
[9] David Berry, Dynamo, *Major Update to The Facebook Pixel—Here's what You Need to Know* (May 23, 2017), https://dbdynamo.com/blog/2017/5/23/major-update-to-the-facebook-pixel-heres-what-you-need-to-know [https://perma.cc/3X3R-F6EZ]; Facebook Business, *What's changing with the Facebook pixel*, https://web.archive.org/web/20170810034608/https://www.facebook.com/business/help/1292598407460746 [https://perma.cc/QRC3-6WE3].

CLASS ACTION COMPLAINT

1    which Facebook historically tracked people across the web). Being embedded in websites as a

2    first-party cookie, rather than as a third-party cookie, causes users' browsers to treat that Pixel as

3    though it is offered by the website they are visiting, rather than by Meta, a third party. When the

4    Pixel is embedded in a website as a first-party cookie, the third-party cookie blocking functions of

5    modern web browsers do not inhibit the Meta Pixel's collection of data. Operating similarly to,

6    and with the same privacy exemptions applicable to, a first-party cookie became another default

7    Pixel setting in or around October 2018. [10]

8         27.    In short, circumventing privacy measures designed to protect users' information,

9    the Meta Pixel consistently captures HTTP headers, Pixel-specific data, and Button Click data on

10   every visit to every website through its default operation. Meta acknowledges that the Pixel is

11   configured to collect this information, and can collect the following non-exhaustive categories of

12   information from the webpages where it is embedded:

13            **Http Headers** – Anything present in HTTP headers. HTTP
             Headers are a standard web protocol sent between any browser
14           request and any server on the internet. HTTP Headers include IP
             addresses, information about the web browser, page location,
15           document, referrer and person using the website.

16           **Pixel-specific Data** – Includes Pixel ID and the Facebook Cookie.

17           **Button Click Data** – Includes any buttons clicked by site visitors,
             the labels of those buttons and any pages visited as a result of the
             button clicks.
18
             **Optional Values** – Developers and marketers can optionally
19           choose to send additional information about the visit through
             Custom Data events. Example custom data events are conversion
20           value, page type and more.

21           **Form Field Names** – Includes website field names like email,
             address, quantity, etc., for when you purchase a product or service.
22           We don't capture field values unless you include them as part of
             Advanced Matching or optional values.[11]

23   _____

     [10] Sergiu Gatlan, Softpedia News, *Facebook to Circumvent Cross-Site Tracking Block with New*
24   *First-Party Cookie* (Oct. 6, 2018), https://news.softpedia.com/news/facebook-to-circumvent-
     cross-site-tracking-block-with-new-first-party-cookie-523089.shtml [https://perma.cc/KR3H-
25   PY5P].

     [11] *Meta Pixel*, *supra* n.5; *see also* Meta for Developers, *Meta Pixel: Advanced*,
26   https://developers.facebook.com/docs/facebook-pixel/advanced/ [https://perma.cc/M3EA-
     LHVM]; Meta Business Help Center, *Best practices for Meta Pixel setup*,
27   https://www.facebook.com/business/help/218844828315224?id=1205376682832142
     [https://perma.cc/SU7N-XGFL]; Meta for Developers, *App Events API*,
28   https://developers.facebook.com/docs/marketing-api/app-event-api/ [https://perma.cc/NV4L-
     XM9S]; Meta for Developers, *Meta Pixel: Get Started*,

CLASS ACTION COMPLAINT

1        28.     In all websites where the Pixel operates, when a user exchanges information with the host of that site—such as through a search query—Meta's software script surreptitiously directs the user's browser to send a separate message to Meta's servers. This second, secret transmission contains the original request sent to the host website, ("GET request"), along with additional data that the Pixel is configured to collect ("POST request").[12] GET and POST requests are communications that contain contents from both the user and from servers associated with the website they are visiting. These transmissions are initiated by Meta code and concurrent with the communications to and from the host website.

29.     Meta associates the information it obtains via the Meta Pixel with other information regarding the user, using personal identifiers that are transmitted concurrently with other information the Pixel is configured to collect. For Facebook account-holders, these identifiers include the "c_user" IDs, which allow Meta to link data to a particular Facebook account, and "xs" cookies associated with a browsing session. For both Facebook account-holders and users who do not have a Facebook account, these identifiers also include cookies that Meta ties to their browser, such as "datr" and "fr" cookies.[13]

30.     The "c_user" ID labelled in Meta's software script reveals a Facebook account-holder's Facebook ID ("FID"). A subscriber's FID is a unique sequence of numbers linked to that individual's Facebook profile. Entering "facebook.com/[FID]" into a web browser returns the Facebook profile of that particular person. A FID thus identifies a person more precisely than a name.

31.     Meta informs website managers that, among other things, the Pixel allows "you…to track Facebook ad-driven visitor activity on your website…[and] use the data to analyze your website's conversion flows and optimize your ad campaigns."[14]

---

https://developers.facebook.com/docs/meta-pixel/get-started [https://perma.cc/5W4A-SKGP].
[12] *How We Built a Meta Pixel Inspector*, *supra*, n.8.
[13] Meta, *Cookies Policy* (Oct. 5, 2022), https://www.facebook.com/policy/cookies [https://perma.cc/6M55-KWA4].
[14] Meta, *Get Started*, https://developers.facebook.com/docs/meta-pixel/get-started [https://perma.cc/5W4A-SKGP].

           CLASS ACTION COMPLAINT

#### IV.     Meta's Use of Pixel-Derived Data for Advertising

32.     Meta feeds the vast quantities of information obtained from the Pixels into its advertising systems, using it to identify users and their personal characteristics, categorize them for Meta's business purposes, and target them with marketing messages from its advertising clients.

33.     Meta acknowledges this use of data acquired through the Pixel tracking code. For example, Meta refers to the Pixel as one of Meta's "Business Tools," and to websites with the Pixel embedded as "Partners." Meta explains in its Privacy Policy, among other places, that Meta uses "[i]nformation from Partners," expressly including information about "[w]ebsites you visit and cookie data," "to provide a personalized experience to [users], including ads."[15]

34.     One of the ways that Meta uses data obtained via the Pixel for advertising is by using it to define "audiences" customized for particular advertisers. Meta sells access to three types of tailored audiences.

35.     Advertisers can purchase access to "Core Audiences," composed of individuals with specified traits and characteristics. Meta assigns users to Core Audiences based on data it has learned or inferred (including via data from the Pixels) about a range of their personal qualities, including users' location, age, gender, education, job title, connections to other Facebook users or pages, interests and hobbies, and behavior such as prior purchases and device usage.[16]

36.     Meta also sells access to "Custom Audiences," meaning the ability to reach "people who have already shown interest in [an advertiser's] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[17] Meta assigns users to Custom Audiences based on information from the Meta social media platform, and/or information

---

[15] Meta Privacy Center, *Privacy Policy* (Effective Jan. 1, 2023), https://www.facebook.com/privacy/policy [https://perma.cc/3S7Y-4SPD].

[16] *Ad targeting*, *supra* n.3.

[17] *Id.*

the advertiser discloses about those users, such as e-mail subscriber lists, and activity tracked on the advertiser's website(s), including via the Pixel.[18]

37.     Meta also sells access to "Lookalike Audiences," a Meta feature that "leverages information such as demographics, interests and behaviors from your source audience [i.e., a Custom Audience tailored from the advertiser's records] to find new people who share similar qualities" with existing customers or Custom Audiences.[19] To generate Lookalike Audiences, Meta uses data it has obtained from across the web, including from the Pixels embedded in third-party websites that have no relationship with the advertiser requesting access to a Lookalike Audience.

## V.     Meta Obtains Information From Labcorp

38.     Labcorp operates the website https://www.labcorp.com/, where individuals can access their medical testing results, book medical testing appointments, request medical testing supplies, and pay for Labcorp services they have received.

39.     Individuals can also search the Labcorp website for, among other things, medical information by using the search bar on the homepage.

40.     Labcorp embedded the Pixel on the Labcorp website homepage during the relevant period, and transmitted extensive information regarding visitors to Labcorp website's homepage to Meta, including the identities of Facebook account holders, health-related information and inquiries (including searches made on the website), and webpages visited as a result of those inquiries.

41.     Meta assigns a unique numerical identifier to each Meta Pixel and maintains records associating each Pixel with the data it transmits and the website where it is embedded.[20]

---

[18] Meta Business Help Center, *Create a customer List Custom Audience*, https://www.facebook.com/business/help/170456843145568?id=2469097953376494 [https://perma.cc/9M5M-VLTA]; *see also* Adespresso, *Facebook Custom Audiences 101: The Complete Guide for Marketers* (Mar. 23, 2021), https://adespresso.com/blog/facebook-ads-custom-audiences-guide/ [https://perma.cc/NL29-3QP3].

[19] Meta Business Help Center, *About lookalike audiences*, https://www.facebook.com/business/help/164749007013531?id=401668390442328 [https://perma.cc/S5T3-99MP].

[20] AdWisely, *Meta Pixel*, https://adwisely.com/glossary/meta-pixel/ [https://perma.cc/Y8VW-SBLC].

CLASS ACTION COMPLAINT

Accordingly, Meta knows which Pixel operated specifically on the Labcorp website and what information and communications exchanged between users and Labcorp were transmitted to Meta by the Pixel on that website.

42.     Meta intentionally obtains confidential communications subject to the protections of CIPA and WESCA between the Labcorp website and users of that website.

43.     Labcorp implemented the Pixel on its website and, by so doing, permitted Meta to intercept and use Plaintiffs' and Class members' data. The software script by which the Pixel operates on the Labcorp website reveals that the Pixel shares identifiable and sensitive health information from the Labcorp website with Meta.

44.     The Meta Pixel has been active on at least Labcorp's homepage website "https://www.labcorp.com/" and transmitted personal information to Meta from users of that webpage.

45.     Labcorp disclosed to Meta the search terms Plaintiffs and Class members entered into the Labcorp webpage, and as depicted below, the FID and the title of the Labcorp webpage visited as a result of that search query in a single transmission as depicted below:



46.     In this example, the intercepted URL contains the title of the Labcorp webpage visited, "cancer colorectal patient," as evidence by the "path" visible in the code:

:method: GET

:path: /tr/?id=715864809660919&ev=Microdata&dl=https%3A%2F%2Fwww.labcorp.com%2 cancer%2Fcolorectal%2Fpatient
s&rl=https%3A%2Fwww.labcorp.com%2F&if=false&ts=1672328826546&cd[DataLayer]=%58%50&cd[Meta]=%78%22title%2
2%3A%22Colorectal%20Cancer%20Screening%20and%20Information%20%7C%20Labcorp%22%2C%22meta%3Adescription%22%3
A%22Routine%20screenings%20significantly%20reduce%20the%20odds%20of%20colon%20cancer%20impacting%20you%20an
d%20your%20family.%20The%20Labcorp%20OnDemand%20Colon%20Cancer%20FIT%20Kit%20may%20make%20sense%20for%20yo
u.%22%7D&cd[OpenGraph]=%78%7D&cd[Schema.org]=%58%50&cd[JSON-LD]=%58%5D&sw=955&sh=874&v=2.9.90&r=stable&a=tm
Simo-GTM-WebTemplate&ec=1&o=30&fbp=fb.1.1671141355107.1533100921&it=1672328821166&coo=false&dpo=LDU&dpoco=0
&dpost=0&cs=automatic&tm=3&rqm=GET

:scheme: https

47.     The FID is displayed in the "c_user" code. In this example, the code is redacted to preserve the privacy of the user:

cache-control: no-cache

cookie: sb=QTUSYyU59F9rwcxDEEhQ4eOd; datr=QTUSY9i7xR64J5kBmvbb-uPc; c_user-         ; dpr-0.833333373069763
2; xs=6%3Amajjxxt5p1vYbA%3A2%3A16624053J97%3A-1%3A2425%3A%3AAcXofOpcLpdudk-rzna8F5Z5WR28icx1hNvbpccDHPcc; fr
=BdQDuEiYVfs0lxYnP.AWU604A1X-TnUrTpzjMU856HsB4.BjrZNU.CZ.AAA.0.0.BjrarN.AWUPyr-gQrs

pragma: no-cache

48.     Meta (or anyone) can identify the user conducting that search by entering "facebook.com/" followed by the FID into their browser bar.

CLASS ACTION COMPLAINT

49.    As indicated above, Labcorp also disclosed to Meta a user's search query string or the search terms entered on Labcorp's homepage in a single transmission as depicted below:



50.    In this example, the intercepted URL contains a user's search query string or the search terms "billing" that was entered on Labcorp's homepage, as evidence by the "path" visible in the code:

51.    Plaintiffs and members of the proposed Classes did not authorize Meta to obtain the content of communications between them and Labcorp, including to review or use this data for advertising or any other purpose. Meta's wide-ranging and near-constant acquisition of sensitive content, such as medically-related search queries, from communications between Plaintiffs/Class members and Labcorp violates CIPA and WESCA.

CLASS ACTION COMPLAINT

52.     Labcorp users are provided no indication that Meta obtained this data, or that Labcorp facilitated or procured Meta's interception of the same.

53.     Labcorp's Privacy Policy, hyperlinked at the bottom of the website's homepage, notes that Labcorp "may share [Users'] Personal Information with agents, contractors or partners of Labcorp in connection with services that these individuals or entities perform for, or with, Labcorp" and "also share[s] aggregate, non-personal information about Website usage with affiliated and unaffiliated third parties."[21]

## **TOLLING, CONCEALMENT, AND ESTOPPEL**

54.     The statutes of limitation applicable to Plaintiffs' claims are tolled as a result of Defendants' knowing and active concealment of their conduct alleged herein.

55.     Among other things, Defendants affirmatively hid their true actions and knowingly made statements that were misleading and concealed the true nature of their conduct and operation. The circumstances of Meta's conduct on and with respect to the Labcorp website would lead reasonable users to believe Meta was not collecting their personal information.

56.     Moreover, Plaintiffs were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their own part.

57.     Furthermore, under the circumstances Defendants were under a duty to disclose the true character, quality, and nature of its activities to Plaintiffs. Defendants therefore are estopped from relying on any statute of limitations.

58.     All applicable statutes of limitation also have been tolled by operation of the discovery rule. Specifically, Plaintiffs and other Class members could not have learned through the exercise of reasonable diligence of Defendants' conduct as alleged herein.

## **PLAINTIFF SPECIFIC ALLEGATIONS**

59.     Plaintiff Howard is a California resident who visited the Labcorp website (https://www.labcorp.com/) in or around December 2022 to conduct searches on the website regarding a variety of sensitive medical issues.

---

[21] Labcorp, *Website Privacy Policy*, https://www.labcorp.com/about/web-privacy [https://perma.cc/6XVK-L623].

60.     Ms. Howard conducted these searches on the Labcorp website from a web browser while in California.

61.     Ms. Howard has had a Facebook and/or Meta account since approximately July 2011.

62.     Each time Meta obtained Ms. Howard's Facebook ID and the searches she conducted on the Labcorp website, it violated her rights under CIPA. Meta obtained this information because Labcorp embedded the Pixel on its website to surreptitiously track and disclose communications between Ms. Howard and Labcorp to Meta.

63.     Meta intercepted Ms. Howard's private information in California when the Pixel Labcorp embedded on its website for the purpose of collecting private information from users such as Ms. Howard routed that information to Meta through Ms. Howard's browser.

64.     Ms. Howard never consented to Meta's interception of this private information or Labcorp's facilitation of the same.

65.     Plaintiff Hernandez is a California resident who visited the Labcorp website (https://www.labcorp.com/) beginning in or around October 2022 and continuing through approximately December 2022 to conduct searches on the website regarding a variety of sensitive medical issues.

66.     Ms. Hernandez conducted these searches on the Labcorp website from a web browser while in California.

67.     Ms. Hernandez has had a Facebook and/or Meta account since 2009.

68.     Each time Meta obtained Ms. Hernandez's Facebook ID and the searches she conducted on the Labcorp website, it violated her rights under CIPA. Meta obtained this information because Labcorp embedded the Pixel on its website to surreptitiously track and disclose communications between Ms. Hernandez and Labcorp to Meta.

69.     Meta intercepted Ms. Hernandez's private information in California when the Pixel Labcorp embedded on its website for the purpose of collecting private information from users such as Ms. Hernandez routed that information to Meta through Ms. Hernandez's browser.

1    70.    Ms. Hernandez never consented to Meta's interception of this private information

2    or Labcorp's facilitation of the same.

3    71.    Plaintiff Reynolds is a Pennsylvania resident who visited the Labcorp website

4    (https://www.labcorp.com/) beginning in May 2021 and continuing through February 2023 to

5    conduct searches on the website regarding a variety of sensitive medical issues.

6    72.    Ms. Reynolds conducted these searches on the Labcorp website from a web

7    browser while in Pennsylvania.

8    73.    Ms. Reynolds has had a Facebook and/or Meta account since approximately 2007.

9    74.    Each time Meta obtained Ms. Reynolds' Facebook ID and the searches she

10   conducted on the Labcorp website, it violated her rights under WESCA. Meta obtained this

11   information because Labcorp embedded the Pixel on its website to surreptitiously track and

12   disclose communications between Ms. Reynolds and Labcorp to Meta.

13   75.    Meta intercepted Ms. Reynolds' private information in Pennsylvania when the

14   Pixel Labcorp embedded on its website for the purpose of collecting private information from

15   users such as Ms. Reynolds routed that information to Meta through Ms. Reynolds' browser.

16   76.    Ms. Reynolds never consented to Meta's interception of this private information or

17   Labcorp's procurement of the same.

18                              **CLASS ALLEGATIONS**

19   77.    Plaintiffs bring this lawsuit under Rules 23(a) and (b) of the Federal Rules of Civil

20   Procedure on behalf of the following Classes:

21   **California Class**. All persons in California who entered search
22   terms into Labcorp's website and who used Facebook during the
     time the Pixel was active on Labcorp's website.

23   **Pennsylvania Class.** All persons in Pennsylvania who entered
24   search terms into Labcorp's website and who used Facebook during
     the time the Pixel was active on Labcorp's website.
25

26   78.    Excluded from the Classes are Defendants, any controlled person of Defendants,

27   as well as the officers and directors of Defendants and the immediate family members of any such

28   person. Also excluded are any judge who may preside over this cause of action and the immediate

family members of any such person. Plaintiffs reserve the right to modify, change, or expand the Class definitions based upon discovery and further investigation.

79.     **Numerosity.** The Classes consist of at least hundreds of individuals, making joinder impractical.

80.     **Commonality and Predominance.** Common questions of law and fact exist with regard to the claim and predominate over questions affecting only individual Class members. Questions common to the Classes include:

    a.   Whether Meta knowingly obtained Plaintiffs' and Class members' personal information from the Labcorp website;

    b.   Whether Labcorp facilitated or procured Meta's unlawful actions;

    c.   Whether Meta and Labcorp obtained express consent to their conduct;

    d.   Whether the conduct of Meta and Labcorp violated the California Invasion of Privacy Act, Cal. Penal Code § 631;

    e.   Whether the conduct of Meta and Labcorp violated the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa. Cons. Stat. § 5701, *et seq.*; and

    f.   Whether Meta should be enjoined from obtaining Plaintiffs' and Class members' personal information from the Labcorp website and/or destroy any information obtained from the Labcorp website.

81.     **Typicality.** Plaintiffs' claims are typical of the claims of the Class members in that Plaintiffs, like all Class members, have been injured by Meta's misconduct in obtaining consumers' personal information from Labcorp and by Labcorp for facilitating or procuring that misconduct.

82.     **Adequacy of Representation.** Plaintiffs will fairly and adequately represent and protect the interests of the Classes. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions, including privacy-protection cases. Plaintiffs do not have any interests antagonistic to those of the Classes.

83.     **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class-wide damages are essential to induce Labcorp

and Meta to comply with the law. Moreover, because the amount of each individual Class member's claim is small relative to the complexity of litigation, and because of Labcorp's and Meta's financial resources, Class members are unlikely to pursue legal redress individually for the violations detailed in this complaint. A class action will allow these claims to be heard where they would otherwise go unheard because of the expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

84. **Injunctive Relief.** Plaintiffs also satisfy the requirements for maintaining a class under Rule 23(b)(2). Defendants acted on grounds that apply generally to the proposed Classes, making final declaratory or injunctive relief appropriate with respect to the proposed Classes as a whole.

85. **Particular Issues.** Plaintiffs also satisfy the requirements for maintaining a class action under Rule 23(c)(4). Their claims consist of particular issues that are common to all Class members and are capable of class-wide resolution that will significantly advance the litigation.

**FIRST CAUSE OF ACTION**
**California Invasion of Privacy Act**
**Cal. Penal Code §§ 630-638**
**On Behalf of the California Class Against All Defendants**

86. Plaintiffs incorporate and reallege the above factual allegations set forth in paragraph 1 through 85 by reference.

87. Plaintiffs Howard and Hernandez (for the purposes of this section, "Plaintiffs") bring this Count individually and on behalf of the members of the California Class.

88. The California Invasion of Privacy Act is codified at Cal. Penal Code §§ 630 to 638. The Act begins with its statement of purpose: "The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."

89.     Cal. Penal Code § 631(a) provides that: "Any person who, by means of any machine, instrument, or contrivance, or in any other manner…willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500)."

90.     At all relevant times, Meta tracked and intercepted Plaintiffs' and California Class members' internet communications exchanged with Labcorp through the Labcorp website.

91.     Meta intercepted these communications without consent from all parties to the communications.

92.     Meta intended to learn, and did learn, some meaning of the content in the communications including without limitation in the URLs, search queries, and other content exchanged between California Class members and Labcorp on the Labcorp website.

93.     The following items constitute "machine[s], instrument[s], or contrivance[s]" under CIPA, and even if they do not, the Meta Pixel falls under the broad catch-all category of "any other manner":

a.     The computer codes and programs Meta used to track Plaintiffs' and the California Class members' communications while they were navigating the Labcorp website;

b.     The Plaintiffs' and California Class members' browsers, as well as their computing and mobile devices;

c.     The web and ad servers from which Meta tracked and intercepted the Plaintiffs' and California Class members' communications while they were using a web browser to access or navigate the Labcorp website;

CLASS ACTION COMPLAINT

1            d.      Interception of the Plaintiffs' and California Class members'

2  communications while they were using a browser to visit the Labcorp website.

3          94.     The plan Meta carried out to effectuate its tracking and interception of the

4  Plaintiffs' and California Class members' communications while they were using a web browser

5  or mobile application to visit Labcorp's website originated in and was executed in California.

6         95.     Labcorp aided and conspired with Meta in allowing it to intercept Plaintiffs'

7  California Class members' communications with Labcorp by implementing the Pixel on its

8  website.

9         96.     Plaintiffs and California Class members have suffered loss by Meta's and

10  Labcorp's violations, including by the violation of Cal. Penal Code § 631, and pursuant to Cal.

11  Penal Code § 637.2, Plaintiffs and California Class members seek damages for the greater of

12  $5,000 per violation or three times the actual amount of damages, as well as injunctive relief.

**SECOND CAUSE OF ACTION**
**Pennsylvania Wiretapping and Electronic Surveillance Control Act**
**18 Pa. Cons. Stat. § 5701, et seq.**
**On Behalf of the Pennsylvania Class Against All Defendants**

16         97.     Plaintiffs incorporate and reallege the above factual allegations set forth in

17  paragraph 1 through 85 by reference.

18         98.     Plaintiff Deborah Reynolds brings this Count individually and on behalf of the

19  members of the Pennsylvania Class.

20         99.     The Pennsylvania Wiretapping Act prohibits: (1) the interception or procurement

21  of another to intercept any wire, electronic, or oral communication; (2) the intentional disclosure

22  of the contents of any wire, electronic, or oral communication that the discloser knew or should

23  have known was obtained through the interception of a wire, electronic, or oral communication;

24  and (3) the intentional use of the contents of any wire, electronic, or oral communication that the

25  discloser knew or should have known was obtained through the interception of a wire, electronic,

26  or oral communication. 18 Pa. Cons. Stat. § 5703.

27         100.    18 Pa. Cons. Stat. § 5725(a) provides that "[a]ny person who intercepts, discloses,

28  or uses or procures any other person to intercept, disclose, or use, a wire, electronic, or oral

- 21 -                                   CLASS ACTION COMPLAINT

communication in violation of the Act is subject to a civil action for (1) actual damages, not less than liquidated damages computed at a rate of $100 per day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred."

101.    Reynolds and Pennsylvania Class members engaged in communications with Labcorp through use of Labcorp's website.

102.    Reynolds and Pennsylvania Class members had a justified expectation under the circumstances that their electronic communications would not be intercepted.

103.    At all relevant times, Labcorp procured Meta to automatically and secretly intercept Reynolds' and Pennsylvania Class members' internet communications exchanged with Labcorp through the Labcorp website in real-time.

104.    To facilitate this interception, Labcorp knowingly embedded the Meta Pixel on its website.

105.    Meta intentionally intercepted those communications in Pennsylvania without consent from all parties to the communications.

106.    Meta intended to learn, and did learn, the content in the communications including without limitation in the URLs, search queries, and other content exchanged between Pennsylvania Class members and Labcorp on the Labcorp website.

107.    Reynolds and members of the Pennsylvania Class were not aware that their electronic communications were being intercepted by Meta.

108.    The plan Meta carried out to effectuate its tracking and interception of the Plaintiffs' and Pennsylvania Class members' communications while they were using a web browser or mobile application to visit Labcorp's website was executed in Pennsylvania.

**THIRD CAUSE OF ACTION**
**Unjust Enrichment**
**On Behalf of the California and Pennsylvania Classes Against Meta**

109.    Plaintiffs incorporate and reallege the above factual allegations set forth in paragraph 1 through 85 by reference.

110.    Plaintiffs bring this Count individually and on behalf of the members of the California and Pennsylvania Classes.

111.    California and Pennsylvania common law on unjust enrichment is applicable for, respectively, the members of the California and Pennsylvania Classes.

112.    Meta has wrongly and unlawfully intercepted, transmitted, received, used, and monetized Plaintiffs' and Class members' internet communications exchanged with Labcorp through the Labcorp website, without sufficient legal consent from the parties to the communications, conferring an economic benefit on Meta. Meta appreciated the benefit conferred upon it.

113.    Meta has been unjustly enriched at the expense of Plaintiffs and Class members, and the company has unjustly retained and secured the benefits of its unlawful and wrongful conduct, and/or passively received a benefit that it would be unconscionable to retain.

114.    It would be inequitable and unjust for Meta to be permitted to retain any of the unlawful proceeds resulting from its unlawful and wrongful conduct.

115.    Plaintiffs and Class members accordingly are entitled to equitable relief including restitution and disgorgement of all revenues, earnings, and profits that Meta obtained as a result of its unlawful and wrongful conduct.

116.    When a defendant is unjustly enriched at the expense of a plaintiff, the plaintiff may recover the amount of the defendant's unjust enrichment even if plaintiff suffered no corresponding loss, and plaintiff is entitled to recovery upon a showing of merely a violation of legally protected rights that enriched a defendant. Meta has been unjustly enriched by virtue of its violations of Plaintiffs' and Class members' legally protected rights to privacy as alleged herein, entitling Plaintiffs and Class members to restitution of Meta's enrichment. "[T]he consecrated formula 'at the expense of another' can also mean 'in violation of the other's legally protected rights,' without the need to show that the claimant has suffered a loss." Restatement (Third) of Restitution § 1, cmt. a.

117.    The elements for a claim of unjust enrichment are (1) receipt of a benefit and (2) unjust retention of the benefit at the expense of another. The doctrine applies where plaintiffs,

while having no enforceable contract, nonetheless have conferred a benefit on defendant which defendant has knowingly accepted under circumstances that make it inequitable for the defendant to retain the benefit without paying for its value.

118.    It is a longstanding principle of law embodied in the Restatement (Third) of Restitution and Unjust Enrichment (2011) that a person who is unjustly enriched at the expense of another may be liable for the amount of the unjust enrichment even if the defendant's actions caused the plaintiff no corresponding loss. Where "a benefit has been received by the defendant but the plaintiff has not suffered a corresponding loss or, in some cases, any loss, but nevertheless the enrichment of the defendant would be unjust…[t]he defendant may be under a duty to give to the plaintiff the amount by which [the defendant] has been enriched." Rest., Restitution, § 1, com. e.

119.    The comments to the Restatement (Third) explicitly recognize that an independent claim for unjust enrichment may be predicated on a privacy tort. Restatement (Third) of Restitution and Unjust Enrichment § 44 cmt. b ("Profitable interference with other protected interests, such as the claimant's right of privacy, gives rise to a claim under § 44 if the benefit to the defendant is susceptible of measurement").

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully requests that the Court:

120.    Certify this case as a class action, and appoint Plaintiffs as Class Representatives and the undersigned attorneys as Class Counsel;

121.    Enter judgment in favor of Plaintiffs and the Classes;

122.    Enjoin Meta from obtaining Plaintiffs' and Class members' personal information from Labcorp and enjoin Labcorp from procuring or facilitating Meta from obtaining Plaintiffs' and Class members' personal information from Labcorp;

123.    Award Plaintiffs and Class members statutory damages they are entitled to under CIPA and WESCA;

CLASS ACTION COMPLAINT

1    124.    Award Plaintiffs and Class members pre- and post-judgment interest as provided

2    by law;

3    125.    Award Plaintiffs and Class members reasonable litigation expenses and attorneys'

4    fees as permitted by law;

5    126.    Award restitution and/or disgorgement of Meta's profits from its unlawful and

6    unfair business practices and conduct; and

7    127.    Award such other and further relief as the Court deems necessary and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demands a trial by jury of all issues triable as of right.

Dated: June 5, 2023                              Respectfully submitted,

/s/ Michael W. Sobol
Michael W. Sobol (SBN 194857)
msobol@lchb.com
LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: 415.956.1000

Doug I. Cuthbertson (*pro hac vice* forthcoming)
dcuthbertson@lchb.com
Margaret J. Mattes (*pro hac vice* forthcoming)
mmattes@lchb.com
LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: 212.355.9500

Brian Levin (*pro hac vice* forthcoming)
brian@levinlawpa.com
LEVIN LAW, P.A.
2665 South Bayshore Drive, PH2B
Miami, Florida 33133
Telephone: 305.539.0593

Matthew R. Wilson (SBN 290743)
mwilson@meyerwilson.com
MEYER WILSON, P.A.
305 W. Nationwide Blvd
Columbus, Ohio 43215
Telephone: 614.224.6000

*Counsel for Plaintiffs and the Proposed Classes*